Case 14-2098, Tawana Pittman et al. v. Spectrum Health System Oral argument not to exceed 15 minutes per side. Ms. Croson for the appellant. Good morning, Your Honors. May it please the Court, Charlotte Croson for appellant in this case. I would like to reserve three minutes for a moment of your own. Thank you. Your Honors, this case is simply put about racial segregation in America. At the behest of one of his clients in March of 2012, defendant Spectrum took in place a facially discriminatory policy. This policy, which applies to all of its employees, discriminates against African American employees by denying them shift assignments solely on the basis of their race. At the time of filing appellant's brief in this case, African American employees have been denied more than 2,700 paying shifts. As of today, Your Honors, African American employees of Spectrum have been denied more than 3,200 paying shifts. They will be denied three more shifts tomorrow. They will be denied three more shifts the day after that. They will be denied three paying shifts every single day for the foreseeable future. Every time defendant makes a shift assignment to this client, it does so explicitly based on the race of the employee it is considering. Defendant admits in its answer that it has not given a single shift to an African American employee for this client since March of 2012. By any reasonable definition of the word policy, and by any reasonable definition of the term, that is a longstandingly wrongful policy. Is there any system like seniority or a union hiring hall of how these assignments are supposed to be made? And is there a specific allegation that your clients were unable to work for any particular time? Yes, Your Honor. There is no system by which assignments are made. It's wholly in the discretion of the employer when assignments will be made and how. As the employer admitted in its answer to the complaint, assignments are not permanent, and assignments are made at the discretion of the employer. Now, in terms of our clients, have they lost work as a result of this policy? Yes, they have. It is alleged in our complaint that because they were removed from assignment to this client and were not reassigned over this period of three years, this policy has been in place, that they have lost shifts. They have lost money. They have lost opportunities. Is there any specificity to that? Because I looked at the complaint, and I read, I think, pretty much the same words. It just says they have suffered and sustained reassignment, loss of hours, loss of pay. But in terms of any specificity to that, that they used to get X hours a week, and now they get somewhat less? No, I don't have any specificity for Your Honor. I know it was an appreciable amount. It was enough. It was not like one shift. I think one client may have gone to half a number of shifts. But, in fact, they have lost shifts. They have lost money. And every African-American employee for Spectrum also loses the opportunity to be placed on this shift. So there's an entire class of shift assignments that African-Americans simply may not compete for because they're African-Americans. The contract with this person, does it give the company the unfettered right to assign anyone? I suppose the person just said, I like Betty. I will pay you if you send me Betty. Would the client have the right to do that? I don't have the contract in front of me, Your Honor, so I can't tell you that. I do know. Would there be anything wrong if that was the situation? Well, at that point, Your Honor, I think you get into a question of fact. In this particular case, the client didn't say, I want Betty. The client says, I want no African-American employees. Now, where the client could say, I want Betty, that would then be a plaintiff's burden to show that what in fact was happening is that the defendant or the client wanted Betty because she was white. But that's not the issue here. There's no issue of pretext. There's no issue of, you know, I asked for Betty and you gave me Betty. The issue here is that the client's guardian asked for only white employees to be assigned to them. And the defendant told plaintiffs in this case, no more African-Americans will be assigned to these shifts. You will not be assigned to these shifts because you are African-American. And from that day forward, from March of 2012 to the present, not a single African-American has been assigned to shift assignments on this client. Now, of course, there's a statute of limitations here, and there's plaintiff's burden to plead facts to show that their case comes within the continuing violations of the doctrine. Now, this doctrine requires that plaintiffs show that there is a longstanding, demonstrable policy of race discrimination. What this essentially means is that they must show that there is a policy that has been in place long enough to say that it is the standard operating procedure of the defendant. Now, the defendant in this case suggests that there is simply one discrete act of discrimination, and that applies in March of 2012 at the time of the reassignment. But that ignores everything that comes after. That ignores the allegations from the complaint defendants on admissions that every time a shift assignment was made thereafter, it was done on the basis of race. And that seems to me to blend the policy question with a serial violation question. And the serial violation, I don't think, is really an issue in the appeal, just the way it comes to us. But I guess the question that I have for both parties, if it's all I see first, is what in the world is the difference between, say, instituting a policy and a decision that is made at some past point that has continuing effects? Well, first to address what a policy is, and then to address the continuing effects, if I may, Your Honor. The first issue is what is a policy? A policy is a guidance that tells you when you have to make a decision, this is how that decision is going to behave, so that every time a decision comes up, you will make the same decision every time. And that guidance, that policy guidance here is every time you make a shift assignment, you will not make a decision. You won't put a white person on it. Well, they still have to make a decision who to send, right? They still have to make a decision who to send. I mean, they have a roster, I presume. Again, we don't know, as you say, whether – but apparently they have been with your clients for ten years. Is that correct? Yes, Your Honor. So it's not a company-wide policy. It is they have been sending people out non-discriminatorily, and then this one client says what they say. Your clients know about it right then, and then we have the question of why don't they sue within the appropriate 180-day period? Because under your theory, they're good to bring the suit 5, 10, 20 years later. Well, as long as the policy is in place, Your Honor, I think they're – As long as this particular client stays alive and stays a client. As long as the defendant continues to assign people to that client on a racially discriminatory basis, this client can decide tomorrow, I was wrong, we're okay, go ahead and send African-American people. Or the company can say to the client, we legally cannot honor your request to send you only white characters. They can end this tomorrow. They have chosen not to. They have chosen to keep going forward.  And what happens, although this has just become a question of fact, is they've been sending Betty, and Betty's happy, the client's happy. This kind of business, you generally don't pick people at random. You like to keep a continuation. So at what point do they have to pull Betty off and what, go to a random selection? Because presumably, there's nothing that says they have to assign your client. They could have said, okay, we're going to pull Betty off, and we're going to pick a name out of the hat, or alphabetically. That would then make it okay even if that had to be white people, or they have to assign your client. I don't expect that they have to assign their client, but they do have to end their policy of racially discriminatory assignments. They can't simply continue it and expect that at some point, because from the point that they instituted it, as long as it's still running, they can't say, well, we instituted it in March of 2012. Anybody who's going to sue us under that policy needs to sue us in 180 days. What happens if you're an employee? It's not anybody. It's at least these people who knew about it. It would be at least a potentially different, interesting question if Sally, who is African American, is hired next year, and she says, hey, this guy's got a nice house. I'd like to be assigned to him. And they say to her, no, you can't. Then it would be a very strong case for her 180 days to start then. Of course, the question comes in, Your Honor. What if she never asks? I think we need to refer back to this court's opinion in Roberts versus Rockwell, where the court says, look, you don't really need to explicitly ask, because it's an automatic denial of every time. There may be things that you're interested in. There may be things that you want to get promoted to. But if, in fact, there's that automatic denial in place, A, you might never know that you could apply, but you never even considered doing it. So Roberts v. Rockwell states that as long as that policy is in place, discrimination is happening. And I would refer this court, as well, to Moran v. AT&T, which is a Supreme Court case, which goes back, again, to Judge Catholic Hsu's question of continuing effects. Now, the continuing effects doctrine first had its expression in United Airlines versus Adams, where the court was considering an admittedly facially neutral seniority system. Now, that's the key here. The difference between a facially discriminatory policy and a facially neutral policy. In United Airlines, the court said, look, if you have a facially neutral policy, and you're applying it neutrally, there's no cause of action for that, even if there is some discriminatory act being passed that has found future further effects due to neutral application of the neutral policy. No disparate impact there. No disparate impact there, Your Honor. I agree with you. And so they say, then, there's no continuing effects. But, they say in Loran's, and considering the same question of neutral policies and continuing effects, they say in Loran's, of course, a discriminatory policy may be addressed at any time. You can attack that discriminatory policy as long as it is in effect. So, I mean, this, your appeal turns on whether this thing is a good policy, under, you know, what the case is, right? I believe so, Your Honor. And, and so you say a policy is some sort of guiding principle for decisions going forward. Yes, Your Honor. And I, I'm sorry, did I tell you? No, I was simply going to ask, this policy, as you're calling it, is there any evidence that this applies to anyone other than this particular patient who expressed this admittedly offensive preference? No, Your Honor, but that's the wrong way around. And I think this is the mistake that the district court engaged in as well. When you look to whether there is a policy, you ask, when you go beyond the discrete event analysis, you ask, can we tell us the discrete event? Because we ask, does it apply to a class of employee? And if it applies to a class of employees and dictates what is going to happen to those employees moving forward, then it's a policy. As I continue overarching policy of discrimination, we don't look to who instituted the policy. We don't look for who asked for the policy to be instituted. A comparable situation might be where Ford builds a plant and it decides to racially segregate in that plant but not in the other plants. It begs belief that the employees in the racially segregated plant would not themselves have a cause matching for racial discrimination. Do we have time?  Great. Thank you, Your Honor. Thank you, Your Honor. Good morning, ladies and gentlemen. My name is Tony Condon here on behalf of the Department of Health, the affiliate of this case. To sustain the continuing violation theory to make claims that were untimely, plaintiffs must show two factors, and they must allege two factors in their complaint. Number one, there must be an overarching policy of discrimination. And number two, they must also show a specific discriminatory act within the limitations period. A plaintiff's immediate complaint fails on both points. First, with respect to the policy, Judge Kethledge raised a very good question. When is the policy and when is it an isolated incident as relating to one particular situation? And I would refer the court for a comparison case to the Chaney v. Plainfield case, which is relied on by the plaintiffs. It's a Seventh Circuit case dealing with a somewhat similar set of facts. In that case, the defendant was a long-term care nursing home, and it explicitly acknowledged its policy of honoring the racial preferences, plural, of its residents, plural, in assigning health care providers. And I understand your point about that, that in that case the—let's have a neutral word—the practice was not limited to one patient. But here's really—I mean, here's my biggest concern about your position. The case law seems to define policy in terms not of how many people outside the organization it affects or concerns, but instead whether it affects a class of employees. That word class shows up again and again and again. Some form of intentional discrimination against the class of which Plainfield was a member was the company's standard operating procedure. And that's the Sharp case. So I'll just start with this point. Doesn't that direct us to look inside the company and whether a class of people inside the company are being treated in a common discriminatory way because of some shared characteristic? Your Honor, I respectfully disagree that Sharp tells us that plaintiffs must demonstrate something more than discriminatory treatment in their case. And here they are saying that this— Well, I mean, I understand that. But this isn't—this policy didn't say Linda Smith, Mark Jones, and Betty—Betty— Betty Goodwin. Are no longer going to be able to go over to this guy's house. It said black people can't go to this guy's house. And so it's not to individuals. It's by its terms it affects the class instead. Again, I think that's the other side of the point. And I suggest that the overarching policy requirement, as stated in Sharp and elsewhere, focuses on the patient side. How will the hospital handle this type of request the next time it receives it? Does the hospital have a policy, such as the Chaney case where the nursing home had a policy of honoring residents' requests based on the patient's or the caregiver's racial preferences? What I don't understand is why it matters on the patients. You know, I mean, I almost think of this as, well, is this just sort of a micro-policy? It affects class within the employer. It only concerns one patient. It's sort of a micro-policy affecting African-American nurses. Or, you know, how many patients would we need? Let's say some other crank says he doesn't want African-American nurses. Now we have two. I mean, is that a policy? Or three? What number does it kick in? It seems unmanageable to me, whereas class seems like a legal concept that we deal with all day long, easy to manage. A situation involving a micro-policy, in my reading of the Sixth Circuit cases, does not establish a long-standing, demonstrable, overarching policy of discrimination. I think it's looking through the wrong lens. And so I think that the focus is on the number of patients and how Spectrum Health applies what it does in other situations like this, as opposed to the people who are harmed from this one decision. And there's only an allegation that this was a one-time decision made in March of 2012. Well, would it be different if the one-time decision, let's take it to the construction company sending out casual labor, and you've got a company that's hiring 100 people a day from my casual labor agency, and all of a sudden that 100 jobs are no longer available. Would that still be a micro-policy, even if it's only one decision? Well, then it's applying to more than just one particular opportunity. It's everybody who has access to that job, and it's a one-time decision. And going forward, we are not going to allow this group of people. But isn't that the crux of both ways? That is, in my company example, it's one decision, but there really are 100 jobs at stake. Here, there might be 100 black employees of your client, but there's only one opportunity each shift. Does that make a difference? Well, you seem to concede that in my big company example, that that could be a continued overarching policy. And I think the difference, Your Honor, is that in your example of the one job, it's not 100 jobs here. It's one job with one patient. I understand. And I think that distinction— That is what makes the size of the arch. In a sense, overarching does imply something that goes to a wide variety of opportunities. I'm trying to ask where the distinction is. You can see it as a gut feeling, but in terms of making that, drawing that line, I'm asking. If it's applied in only one situation, regardless of the number of persons who are harmed by that one-time decision with respect to that one opportunity, I don't believe that qualifies as a policy sufficient to invoke a continued violations doctrine. And I would also note that there's no reference to the word policy. It doesn't even appear anywhere in the amendment complaint. It appears that this is all after the fact, attempted— an attempt after the fact to make an untimely claim timely by trying to jam this into the continued violations doctrine, where it doesn't really belong. Is there a particular reason in terms of things that happened in the company that generated this, in fact, complaint? I mean, were there internal discussions, or did they just wake up one morning and decide, we'll sue you two years afterward? I have no idea what caused them to sue when they sued. That's not on the record. I haven't taken a deposition. I don't know. But it's clear they would at least have a facial cause of action if they had brought it within 180 days. Correct. Correct. And moving on, the second piece, even— No, it's not the second piece. Yes. So let's assume that even if the— Which case says that there has to be an allegation specifically of a discriminatory act or an allegation. So if the court looks at C, technologies, versus the Blue Result Court decision, 753F3594 at page 600, that's a 2014 Sixth Circuit decision. In that case, the Sixth Circuit said this, that, quote, end quote. The Sixth Circuit then went on to say, quote, end quote. What does that mean? Well, that means that the Sixth Circuit continually makes a distinction between the present effects of past discrimination versus ongoing new discriminatory effects within the limitations period. New discriminatory effects or new discriminatory acts. Thank you for that clarification, Judge Fox. So, I mean, but this surely just must be another way of stating a policy question, right? Because if there is a policy in place, and pursuant to its continued implementation, people are being discriminated against, then within the limitations, that surely would be the doctrine of the law, right? And I want to refer back to Judge Fox's comment earlier. He referred to this as a roster. And if the court looks at the Sixth Circuit decision in Cox v. City of Memphis, 230F3199, an issue in that case were promotions that were based on an allegedly discriminatory promotion roster. So the plaintiffs in that case claimed that the roster itself was created in a discriminatory way. And thereafter, they claimed that promotions that were based on that roster were also discriminatory. So every promotion they didn't have a fair chance at because of the way the roster had been made up earlier. Correct. And the Sixth Circuit rejected the continued violation doctrine in that case because the discriminatory act was the creation of the roster in the first place. Decisions thereafter… Was that a policy in that case? I don't know if it was a policy or not. The creation of the roster was the policy. The roster was created, you know, as a result of tests or seniority. Yes. That sort of police testing in that case. So there was an allegedly discriminatory test or basis of the roster that happened back in the past. And the Sixth Circuit found that the discriminatory event in that case was promulgating the roster. It was not making decisions based on the prior decision of the creation of the roster. It just depends on whether that's a policy. I mean, what's the point of having a continuing violation doctrine that is predicated upon policy if continued implementation of that policy isn't enough to satisfy the second requirement that there be some discriminatory act in the implementation period? It just seems to be a totally pointless inquiry. That's what the Sixth Circuit cases require. That's what we said. Well, isn't it to make this cut between something bad happened in the past over 30 years down the road? It's a doctrine of repose, frankly, because it indicates that there still is some continuing effects. They say the continuing effects versus the new act. It concedes that on the other side of the line is something that does have continuing effects. And here, as the district court found, this was a discreet one-time decision that was made in 2012, in March of 2012. There's no evidence. There's no allegation that that decision has been revisited, that it's been revised. It was communicated to the plaintiffs at that time. The question I have for Ed is would it be different if her clients were people who had been hired into the company this year and they said, hey, we hear that he's a racist or he's got a nice house and he's otherwise a nice guy, so I'd like to be assigned to that shift. And they say, no, you won't. Would that person have another 180 days from that communication? That's a fair question, Your Honor. That's certainly not what happened here. If it was a situation where a new employee had no reason to know of the earlier decision, I think it would be inappropriate to hold a new employee accountable for a decision that he or she was not aware of. Our situation here is, as alleged, it was directly communicated to them at the time that the decision was made. And that starts the clock ticking. Counselor, in your characterization, this wouldn't be a policy or even a mini-policy. This is a specific practice. This is a one-time practice that was carved out for a particular client. Under a very unique set of circumstances. Who expressed a very specific preference, while perhaps discriminatory, in this one instance you accommodated. Is there any evidence in the record to support the idea that this might be a policy which went beyond this particular practice with regard to the patient? In other words, one of Plato's complaints is, we were denied the opportunity to conduct discovery. Why shouldn't they have been able to conduct discovery in order to fend off this dispositive notion? Number one, it wasn't raised well, so the argument is waived. And number two, discovery theoretically could go towards the existence of a policy. It's not going to give them any evidence to substantiate an adverse employment action taking place during the limitations period. Which is the second part of the test. You have to have a policy, and there must be... What about evidence that there was another patient who expressed a similar preference? And these plaintiffs are simply unaware of that practice. Is that a fishing expedition? Why isn't there a fair game for plaintiffs? That doesn't relate to the circumstances of what happened to plaintiffs. Plaintiffs have alleged that that happened to them. And the injurious act that must happen within the limitations period must be directed at the plaintiffs. Mr. Condon, that's another hypo for you, real quick. Thank you. Let's say we have a company, 100 employees. It has a racist owner of the company. It's closely held. And he has African-American employees in a number of positions. But he makes a decision, which he announces, that I'm never going to have an African-American CFO at one position. Why? Because I don't think they can be trusted with money. So he says, I'm never going to have that person in that position. Over time, a number of African-Americans apply for that position when it's open. Every time, they're rejected. And then finally, one of them applies, gets rejected again, pursuant to that same decision from years past, and brings suit. I guess under your conception of continuing violations, if the decision was made more than two years back or whatever the limitations window is, that's not actionable. It's just one position. If the plaintiff in that case knew of the decision when it was made two years ago, then I believe that the plaintiff is held accountable for the time frame starting at that point in time, and that he or she does not then have an open window for the next 30 years, if you use Judge Fox's example, to bring a claim based on that decision that was communicated. Is that the case even if the job was never open earlier? Because this is the first time the job has been open. In other words, can you be discriminated against by being told you can't get a job that isn't open now? Wouldn't it be more plausible that the window to sue would start when he not only knew of the policy, but when there was an opportunity for it to be applied to him? Yes. Okay, thanks. Appreciate it. Thank you. Thank you. There's remaining time for a vote. Thank you, Your Honors. And just to address a few issues. Further counsel's indication of ZTEG. ZTEG is a security, it's an antitrust case. I don't believe that these antitrust continuing violations cases fully capture the continuing violations, application of continuing violations in the employment discrimination context, where you have such things as facially discriminatory hiring, retention, and assignment policies. Cox versus City of Memphis, going back to this roster. In fact, the discrimination in that case was that the police department gave extra help to certain candidates to help them do well on the test. So the discriminatory action wasn't even in the roster. The roster itself was facially neutral. Application of the roster was facially neutral. The discrimination came in from these individuals. Does the opinion make that distinction? I mean, it seems to me that you have a racist make-up of who they could just as easily have made the roster, because they were only helping the white people, right? I do understand, Your Honor. And holding in Cox, if you just give me one second at once, that the promotions were facially neutral events. They did use the distinction of facially neutral, as used in United Airlines versus Evans again in Orange County. So in our case, if they simply made a roster for Mr. Jones and put all the African-Americans at the bottom, then that would have been facially neutral? I think if you say to people, look, what we're going to do is we're going to make a roster. We're not going to put any African-Americans on it. We're going to keep doing that. And you're never going to be promoting because you're black. I think you have a better argument that you have a policy than if what happened is— No, but you're trying to distinguish Cox by saying that this roster, which was made up because of racial activity, is facially neutral. So I was saying, suppose the company said, OK, we're going to have a roster. We're just going to put all the blacks at the bottom, so they're not going to rise to the top of the roster. That would be the way you're trying to distinguish Cox, but that wouldn't be any different. No, I think the way that I'm trying to distinguish Cox, Your Honor, and I apologize for disagreeing. I think the way that I'm trying to distinguish Cox is to say if the department said we are never going to promote black people by any way, hook or crook, we're simply not going to do it. And then they accomplish it to various means, such as a roster or not giving people interviews and things of that nature. Then that looks more like a policy. So you're really saying the roster in Cox isn't a policy? No, no, the roster in Cox is not a policy. It's something that affects individuals, named individuals, right? That roster rather than class or minors. Well, it affects every person on the roster. Your position on the roster has been affected because of the fact they've slotted white people ahead of you. But it doesn't affect everyone in the police department. In this case, defendant's policy here affects everybody who works here. It doesn't affect the class. The roster is for all promotions from lieutenant to major or something like that? Yes, I believe that's correct. I don't remember the facts, but it's that kind of thing. Yes. So it's a class of people who are lieutenants who want to be captains or majors. Possibly, but I think the more accurate case here is Roberts. The cases that are on point more here are Roberts and Moran. Do you think you can get the questions? Thank you, Your Honor. Thank you, counsel. The hearing is fully submitted. The clerk can call the next case.